## LEIBING AUTOMOTIVE DEVICES, Inc., v. WILDERMUTH.

### No. 8320.

District Court, E. D. New York.

May 5, 1938.

Strauch & Hoffman, of Washington, D. C., and Ward, Crosby & Neal, of New York City (William A. Strauch and Rex P. Mulligan, both of Washington, D. C., of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (George F. Scull, Harold F. Watson, and H. H. Hamilton, all of New York City, of counsel), for defendant.

BYERS, District Judge.

In this cause the parties are reversed, in effect, to those in 23 F.Supp. 214, in that the defendant there is the plaintiff here, and the plaintiff there, being the manufacturer of the accused structure in this case, has assumed and conducted the defense, and will be referred to, for convenience, as the defendant.

The patents involved are: Leibing No. 2,026,947, applied for May 31, 1932, granted January 7, 1936; Leibing No. 2,068,298, applied for March 18, 1935, granted January 19, 1937; Leibing et al. No. 2,081,825, applied for August 2, 1934, granted May 25, 1937.

The issues are validity, prior use, and infringement.

It will be convenient to discuss them in that order.

The first patent has to do with "method and apparatus for governing flow lines" and involves the relation between the throttle valve and governing valve with reference to the impact upon the latter of the stream or column of fuel as it leaves the carburetor and gains access to the governor valve after passing through the gateway provided by the throttle valve.

Claim 23 is in issue:

"23. In .combination with means responsive to the rate of fluid flow in a conduit for governing said fluid flow through said conduit, a butterfly valve adjacent said governing means for controlling the fuel flow toward the latter, said butterfly valve being designed to direct a portion of the fluid flow to said governing means, when the butterfly valve opening is relatively small so as to insure responsiveness of the governing means at substantially all rates of flow."

The closing movement of the governor valve, according to the drawings, is counter-clockwise, while that of the offset throttle (butterfly) valve is clockwise. The conformation of the former is similar to that considered in the earlier cause, and is not a matter in issue here. Figure 1 of the drawing discloses what appears to be still another butterfly valve, on center, in the opened position, and having its upper side immediately adjacent to if not in contact with the larger vane of the governor valve when the latter is fully opened, but that is not a feature of the invention. It is called a degassing device and, for reasons stated by the patentee, it will not be herein discussed.

It will be recalled that the throttle valve is manually operated since it is moved by the accelerator.

As has been stated in the other case, when it moves toward closing, it tends to minimize the difference in pressures below and above the governor valve, which retards the closing effort of the latter.

Apparently this patentee had in mind that such closing movement of the throttle valve could be conceived of as diverting the fuel flow, so that, if the closing movements of the two valves could be contrived in opposite directions, the flow from the edge or tip of the throttle valve nearest to the governor valve could be manipulated so that its impact against the larger division of the latter would assist the closing movement of that valve. It is not asserted that in this way the throttle steal piston discussed in the earlier case, 23 F.Supp. 214, can be dispensed with, but the patent seems to be restricted to so disposing the two valves that the above diversion can be brought about.

The patentable invention, if any, is quite elusive.

There had to be a relation between these two valves, so there was no discovery involved in that. The off-center construction of butterfly valves was old.

Novelty was not claimed for the governing valve structure of Leibing, so that could

not have been a part of the inventive concept.

Since the partial closing of the throttle valve was inevitable through the operation of the accelerator, and since its effect was taught by Hufford No. 1,537,944 (application filed August 22, 1923), it is difficult to discern wherein Leibing was imparting new information in describing the objects of his invention. For instance, he says (page 1, line 28) "Another object * * * is to associate a flow governing valve with the flow regulating (throttle) valve of a combustion engine so that the action of the former is in great part dependent upon the position of the latter." Again: " * * * to devise a method of governing flow in response to both velocities and pressure differentials, and to provide a governor suitable for carrying out the method."

Perhaps it may be said that Leibing was asserting that, under the partially closed position of the throttle valve, the governor valve was subjected to two impulses:

(a) A tendency to open due to the differences in pressures below and above it; and

(b) A tendency to close as the result of impact upon its larger section by the flow of fuel said to be diverted thereto, by the angular relation established by the partly closed position of the throttle valve.

In order that the latter might function, the valves had to rotate in opposite directions. This is explained (line 3, page 3). It is said later (page 4, line 42) that it is intended to use the same type of valve for the throttle valve, as the governor valve, but this is not shown in the drawings or in the actual devices offered in evidence. The one claim in suit makes no clear mention of the opposing movements in rotation of the two valves, but it is possible to infer that such is the teaching of the patent from what can be deduced from the drawings and the specifications.

Was it patentable invention so to envision the closing movements of these valves? The answer must be in the negative if Hufford No. 1,912,773 is understood (See page 2, line 31 et seq.). See also Bull No. 2,048,423.

If this patent had taught that the opposing movements of the valves in the relation disclosed would obviate the use of the throttle steal piston, a better argument for validity could have been made.

Claim 23 states that the throttle valve is a butterfly valve "being designed to direct a portion of the fluid flow to said governing means, when the butterfly valve opening is relatively small."

The trouble with that expression is that the butterfly throttle valve of this patent has not been so designed. The file history shows that this claim was transferred from another patent application which was granted and is not in suit, which disclosed a specially designed duplex-vane type of butterfly throttle valve, which was said to function in accordance with the quoted language. The claim had a place in that application, but is lacking in significance here, because the construction of that design of carburetor valve could be related to the size of the opening or gateway when the valve was nearly closed, and the flow of fuel through or around the carburetor valve toward the governor valve.

The only possible remaining argument for patentable invention has to do with the relation between the valve centers; that is, they are not in alignment, but are "slightly offset." There is no teaching as to the proportion or relation of offset between the centers, nor is there disclosed a formula for establishing it. That being so, it is unnecessary to consider whether so empirical an adjustment could constitute invention.

Upon the evidence as a whole, it is concluded that this patent lacks validity.

If this conclusion be found erroneous, the question of infringement remains. As to that, it is sufficient to say that, of all adjustments to various motors which are made of the defendant's structure, only a comparatively few are involved in this aspect of the controversy; namely, on certain of the Dodge 1937 and DeSoto engines. Adjustment was made in order to correct a condition pertaining to the distribution of fuel to the engine cylinders, as to the Dodge trucks, which created a non-infringing relation of the valves. The instruction sheet upon which plaintiff relies is blind in its wording, so far as this question is concerned, and the entire matter is so trivial that no finding of infringement will be made.

The next patent, Leibing No. 2,068,298, has to do with the association of an automatic spark control and a governor. The former element is new to the matters previously considered in this and the prior case, and is actuated by ingenious mechanical

means for employing the pressure differential in the conduit, to advance or retard the spark in synchronism with the opening and closing of the governor valve, or the throttle valve, as the case may be, depending upon which of them is in control of the volume of fuel mixture going to the engine, at a given period of time.

When the throttle valve is in control, the degree of vacuum adjacent to it is communicated through a diaphragm to the distributor, thus causing the spark to advance or retard.

When, by reason of a change in the position of the throttle valve, the governor valve takes over control, it becomes necessary to shut off the communication of the pressure adjacent to the former, and substitute for it the effective pressure at or near the governor valve. This is successfully accomplished in both the patented device and the accused structure.

Claims 2, 3 and 4 are in issue, and the latter is typical, and is as follows:

"4. In a governing mechanism for an internal combustion engine, a governor body; a main passage in said governor body; a relatively small auxiliary passage in said governor body substantially paralleling said main passage and in close proximity thereto; relatively short cross passages connecting said main passage and said auxiliary passage adjacent the opposite ends thereof; a third passage intersecting said auxiliary passage at points between said cross passages; a valve in said main passage positioned between said cross passages whereby on movement of said valve to a flow restricting position, said valve tends to set up a differential of pressures between said cross passages; and a piston in said auxiliary passage subject to the differential of pressure between said short cross passages, said piston being arranged to establish communication between the points of intersection of said third passage and to interrupt the communication between said points of intersection in response to the pressure differential between said cross passages."

No question of infringement is involved, so that consideration may be promptly directed to the defenses of invalidity and prior use.

As to the first, reliance is had upon Darnell No. 2,039,396, applied for September 30, 1933, and granted May 5, 1936. Two embodiments of the teaching are presented. The first operates the transfer of pressure to the distributor manually, and the second automatically.

Since the plaintiff's patent deals with the latter principle, discussion will be confined to the patentable invention found in Leibing, if any, over the second embodiment taught by Darnell.

A close reading of these patents has failed to reveal to this Court any difference in invention. Leibing does not purport to be an improvement upon Darnell, and the only distinctions between the devices are purely mechanical. In Darnell, the piston which controls the spark advance is disposed at a right angle to the conduit, and there are two grooves shown in which pressure is communicated to the spark control piston. In Leibing, that piston moves in a cylinder parallel to the conduit, and but one pressure chamber is provided for actuating it.

Darnell thus describes his construction (Page 3, line 23 et seq.): "* * * the vacuum transfer valve is a cylindrical member 60 operating in a cylindrical chamber 61 in the wall of the governor housing." Therefore there is no teaching that it must be perpendicular to the conduit. To dispose it parallel to the conduit was equally within the disclosure.

The mere substitution of one pressure conducting agent, for two, can scarcely rise to the height of invention.

The preliminary recitals of Leibing introduce nothing not made entirely clear by Darnell in his specifications, and the argument for validity on the part of the former as against the latter boils down to this: That Adler, the co-patentee with Darnell, admitted in his deposition that, under the construction shown in the patent drawing, the piston controlling the spark advance could not be gotten into the assembly. Granted that this must be true if the patentee admits it, clearly nothing more than a mere mechanical adjustment was involved in overcoming that difficulty.

Darnell so completely anticipated Leibing that the issue of validity must be resolved against his patent No. 2,068,298.

If this is a mistaken view, there remains the question of prior use. The defendant's evidence is the more persuasive since Darnell and Adler received their patent as assignors to the defendant. The application was filed, as has been said, in September, 1933, and the patentees gave their address as in care of the defendant; for

that reason, it is easy to understand that the defendant's showing of the design, construction in June, 1934, and operation of its device in July of 1934 at the International Harvester Company, must be deemed to be likely happenings.

Adler had been in the employ of the defendant since 1931, and said that he tested the automatic spark control device before it was tested at the International Company. There is no reason to discredit that testimony, and every apparent reason for accepting it.

The test itself is established by the testimony of Larsen, who conducted it, and his report is Exhibit Q. In connection with the road test, page 11 contains the following:

"(2) Vacuum tube connected to governor which was equipped with an automatic valve, transferring the vacuum from carburetor to a point below governor valve."

There was another test on February 6, 1935, at the Dodge plant, reported in detail in Exhibit R, and Exhibit S is a carbon (office) copy of a sales slip dated February 20, 1935, for one "Special 95 S Governor with Vacuum Control Piston for Automatic Spark."

The testimony concerning these tests has been carefully reexamined in light of the criticisms addressed to it in the plaintiff's brief and, taken as a whole, is deemed to establish that the tests were made with governors of the defendant's manufacture containing, as part of their structure, automatic spark control devices substantially the same as plaintiff's Exhibit 6, the accused structure, and it is so found.

The plaintiff, by way of antedating the actual use so demonstrated by the defendant, has offered evidence of a still earlier use by it of the device which it manufactures under the Leibing patent in suit; namely, the fabrication of such a governor containing such a spark control mechanism, at a time prior to April of 1934, when Mr. Leibing sent the next model (Ex. 17) to Mr. Fageol, the president of the plaintiff company, from the former's laboratory in California, at an undisclosed date somewhat prior to April 27, 1934. Mr. Leibing thus describes the first structure in comparison with plaintiff's Exhibit 17:

"It was not housed within the governor body itself. It was composed of tubes and pipes and arranged on the outside of the governor, just a make-shift experiment."

That first device has been lost, and no date can be stated as to when it was tested. Mr. Leibing is sure that he made some sketches for it but could not produce them. The first sketch of which he can give a date accompanied the description used in applying for the patent in suit which was received in the office of his attorneys on February 21, 1935.

That can be accepted as the date of disclosure, but the earlier experimentation is not sufficiently precise to go back of the July 13, 1934, use shown at the International Harvester Company plant by the defendant.

The plaintiff's first use of its device was at a test at the Chevrolet plant on April 11, 1935.

The issue of prior use is thus resolved in defendant's favor.

The third patent, Leibing No. 2,081,- 825, contains 5½ pages of descriptive matter and 8 claims, of which 1, 2, 5 and 8 are in suit. The last will be quoted:

"8. In a maximum speed governing device, a conduit, a pivoted valve in said conduit for controlling the effective flow area therein and responsive to the velocity of fluid flow therethrough, and means to close said valve upon the establishment of a predetermined vacuum in said conduit, said means comprising a reciprocatory plunger positioned to contact said valve to effect closing thereof, a cylinder secured to said governing device, a piston in said cylinder for operating said plunger, means to subject one side of said piston to vacuum in said conduit, means to subject the opposite side of said piston to atmospheric pressure and means to maintain said valve closing means inoperative with reference to said valve at all pressures above said predetermined vacuum."

Stated in lowest terms, the invention as claimed consists in the familiar throttle and governor valve structure found in plaintiff's device, plus the throttle steal piston, not connected to the governor valve except when it functions to urge the latter toward a closing position in obedience to the change in pressure below it, resulting from the partial closing of the throttle valve.

Was it patentable invention to sever the throttle steal piston from the governor valve? If so, it was certainly not of a high order, since operation requires contact between the two, and unless it can be said that permanent union between them inter-

fered with the governing function of the governor valve by impeding it when the throttle steal piston was not summoned into action, the change would seem to constitute a mere mechanical expedient.

As to the interference, it is true that the patentee states that such union hampers the operation of the governor under other than throttle steal conditions and "the sensitivity thereof is reduced."

The testimony is not persuasive on that subject, because, at most, it developed a difference of opinion on the part of those schooled in the subject. No attempt was made to prove the hampering tendency as alleged, in figures of any kind.

Both structures include a light spring to hold the piston out of action until conduit pressure conditions overcome it. Without that spring, a loss of governing function is shown, but the defendant says that can be compensated by adjusting the main or governing spring, and no contradiction of that testimony appears. The defendant's piston is in neutral contact with an opposing member on the valve, while the plaintiff's is quite apart in the physical sense.

The mere severance itself of the piston from the governor valve was not new. Knauss No. 1,670,365 disclosed it, and the plaintiff had difficulty in prosecuting its application because of that patent, which was finally overcome at a late stage, by inserting appropriate reference to the spring above referred to.

Since this patentee was dealing with a subject which had been expounded first by Hufford No. 1,537,944 as to the throttle steal condition and means to overcome it, any mechanical adjustments of structure which involved no new mechanical principles would scarcely expose to view anything but a facility of selection among known or obvious means to accomplish a given purpose.

As Knauss taught that the piston could successfully assist in the closing movement of the valve without being affixed to it, the insertion of the spring added nothing to the capacity of the piston to function. Holding it out of action when not needed is a negative thing, at best; it does not assist the piston to function; it simply keeps it out of the way when not needed, and the necessity for so doing is left in such doubt by the evidence that patentable invention cannot be accorded to that aspect of the device.

It is concluded that validity has not been established as to this patent.

If this conclusion is found to be incorrect, it will be necessary to consider the subject of prior use. It occupies a considerable portion of the briefs, and has been considered for that reason.

■ The question involves experiments made by the defendant in 1929 with what is called the Petit governor (Exhibit L). That device was offered to the defendant company, and tested by it, for governing capacity; as an incident to that testing, a severed throttle steal piston was included, because it was recognized that the governor would not function successfully without such an auxiliary mechanism. The latter was an incident merely, and nothing persuasive is shown to the effect that a disconnected piston, as such, was regarded as a subject for experimentation or research. Nor did the experiments ripen into anything of import to the instant issues.

It is considered that the defendant has not sustained its burden of proving prior use of a disconnected throttle steal piston in connection with the Petit device.

■ The foregoing contains, in narrative form, the findings and conclusions of the Court, and is thought to comply with the requirements of Equity Rule 70½, 28 U.S. C.A. following section 723. If counsel are persuaded otherwise, findings and conclusions, according to what has been written, may be settled on notice. See Equity Rule 11 of this Court.

Settle decree in accordance with the foregoing, in favor of the defendant, with costs to be taxed.